IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| 3D MEDICAL IMAGING SYSTEMS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| VISAGE IMAGING, INC., and PRO MEDICUS LIMITED, | : | CIVIL ACTION NO. 2:14-CV-267-RWS |
| | : | |
| Defendants, | : | |
| | : | |
| v. | : | |
| | : | |
| 3D MEDICAL IMAGING SYSTEMS, LLC, MEDFLEX, LLC, and MAURICE L. BAILEY, | : | |
| | : | |
| Counterclaim Defendants. | : | |

## **ORDER**

This case comes before the Court on Counterclaim Defendants 3D Medical Imaging Systems, LLC,[1] MedFlex, LLC, and Maurice Bailey's Motion for Partial Summary Judgment [67] and Defendants Visage Imaging, Inc. and Pro Medicus Limited's Cross-Motion for Partial Summary Judgment [72].

---

[1] While 3D Medical Imaging Systems, LLC is also the Plaintiff in this case, for ease, the Court will refer to it solely as one of the Counterclaim Defendants.

After reviewing the record, the Court enters the following Order.

## Background

This is a patent case. The patent in question is U.S. Patent No. 6,175,655 ("the '655 patent"), which the United States Patent and Trademark Office ("PTO") issued on January 16, 2001 to Integrated Medical Systems, Inc. ("IMS"), a non-party to this case. The '655 patent expired on January 16, 2013, because IMS decided not to pay the relevant maintenance fee to the PTO. After his company acquired the '655 patent out of IMS's bankruptcy estate, Counterclaim Defendant Maurice Bailey petitioned the PTO to reinstate the '655 patent under the "unintentional delay" standard for late payment of maintenance fees. See 37 C.F.R. § 1.378(a)-(b). At the time, Mr. Bailey did not know whether IMS's non-payment of the maintenance fee was in fact unintentional. Nonetheless, the PTO granted his Petition and reinstated the '655 patent. The sole issue here is whether Mr. Bailey's certification that the non-payment of the maintenance fee was "unintentional" constitutes inequitable conduct such that the '655 patent is unenforceable.

I.  **Statutory Background**

To maintain a patent, its owner must pay maintenance fees to the PTO at

2

various points throughout the patent's life. See 35 U.S.C. § 41(b). Those maintenance fees are due 3.5 years, 7.5 years, and 11.5 years after the patent is granted. Id. § 41(b)(1)(A)-(C). "Unless payment of the applicable maintenance fee . . . is received [by the PTO] on or before the date the fee is due or within a grace period of 6 months thereafter, the patent shall expire as of the end of such grace period." Id. § 41(b)(2).

But even if a patent owner fails to pay a maintenance fee on time, 35 U.S.C. § 41(c)(1) authorizes the PTO Director to accept delayed maintenance fees and to revive an expired patent under certain circumstances. It says, in relevant part: "The Director may accept the payment of any maintenance fee required by subsection (b) after the 6-month grace period if the delay is shown to the satisfaction of the Director to have been unintentional." 35 U.S.C. § 41(c)(1). PTO regulations then lay out the specific requirements for a petition to accept an unintentionally delayed payment:

> Any petition to accept an unintentionally delayed payment of a maintenance fee must include:
>
> (1) The required maintenance fee set forth in § 1.20(e) through (g);
>
> (2) The petition fee as set forth in § 1.17(m); and

3

> (3) *A statement that the delay in payment of the maintenance fee was unintentional.* The Director may require additional information where there is a question whether the delay was unintentional.

37 C.F.R. § 1.378(b) (emphasis added). If the PTO grants a petition for late payment, "the patent shall be considered as not having expired at the end of the grace period." 35 U.S.C. § 41(c)(1).

## II.     Factual and Procedural Background

Just before the 11.5-year maintenance fee was due on the '655 patent, IMS's patent attorney sent letters to IMS's president advising him that, to avoid lapse of the '655 patent, IMS needed to pay the 11.5-year maintenance fee on or before January 16, 2013. (July 13, 2012 Brunda Letter, Dkt. [72-31] at 2.) IMS's president responded, "[u]nfortunately, I think we will need to let [the '655 patent] go." (Jan. 7, 2013 Kneale Email, Dkt. [72-15] at 1.) IMS's patent attorney then confirmed that they would take no further action as to the '655 patent. (Jan. 8, 2013 Delgadillo Email, Dkt. [72-15] at 1.) Because IMS did not pay the 11.5-year maintenance fee, the '655 patent expired on January 16, 2013. (Not. of Patent Expir., Dkt. [72-16].) Shortly thereafter, IMS filed for bankruptcy. (Counterclaim Defs.' Resp. to Defs.' Statement of Undisputed

4

Mat. Facts ("CC Defs.' SMF Resp."), Dkt. [78-1] ¶ 26.)

On February 7, 2014, the bankruptcy court authorized the sale of IMS's patent portfolio by auction. (Id. ¶ 28.) On April 8, 2014, IMS's bankruptcy trustee assigned some of IMS's patents, including the '655 patent, to Counterclaim Defendant MedFlex, LLC ("MedFlex"). (Id. ¶ 29.) Mr. Bailey is MedFlex's sole owner and member. (Defs.' Resp. to Counterclaim Defs.' Statement of Undisputed Mat. Facts ("Defs.' SMF Resp."), Dkt. [72-3] ¶ 2). MedFlex then assigned the '655 patent to Counterclaim Defendant 3D Medical Systems, LLC ("3D Medical"). (CC Defs.' SMF Resp., Dkt. [78-1] ¶ 8.) As with MedFlex, Mr. Bailey is the sole owner and member of 3D Medical. (Defs.' SMF Resp., Dkt. [72-3] ¶ 1.) He is also 3D Medical's only employee. (Bailey Depo., Dkt. [72-8] at 17.)

When MedFlex acquired the '655 patent, Mr. Bailey knew that it had expired because IMS failed to pay the 11.5-year maintenance fee. (Defs.' SMF Resp., Dkt. [72-3] ¶ 5.) He also knew that IMS had filed for bankruptcy roughly two months after the 11.5-year maintenance fee was due. (Id. ¶ 14.) Nonetheless, he understood that the PTO has a procedure by which an expired patent can be reinstated if: (1) the owner pays the original maintenance fee plus

5

a late fee; and (2) the delay in payment was unintentional.  (Id. ¶ 6).  So Mr. Bailey submitted to the PTO a "Petition to Accept Unintentionally Delayed Payment of Maintenance Fee in an Expired Patent (37 CFR 1.378(b))" ("the Petition").  (Id. ¶ 8.)  He did so using the PTO's online standard form, which was pre-populated with the statement: "The undersigned certifies that the delay in payment of the maintenance fee to this patent was unintentional."  (Id. ¶¶ 9-10.)  The online standard form did not provide any space for further explanation about the delay in payment.  (Id. ¶¶ 11-12.)

Mr. Bailey acknowledges that when he submitted the Petition he had no personal knowledge of IMS's motivations in not paying the maintenance fee on time.  (Id. ¶ 17.)  He also acknowledges that he submitted the Petition without any investigation into the circumstances of IMS's non-payment of the maintenance fee.  (CC Defs.' SMF Resp., Dkt. [78-1] ¶ 40.)  The PTO granted the Petition on the same day Mr. Bailey submitted it.  (Defs.' SMF Resp., Dkt. [72-3] ¶ 13.)

On November 7, 2014, 3D Medical filed this suit against Defendants Visage Imaging, Inc. ("Visage") and Pro Medicus Limited ("Pro Medicus") (collectively "Defendants"), alleging infringement of the '655 patent.  In their

6

Amended Answers, Defendants raise the affirmative defense of inequitable conduct, alleging that the '655 patent is unenforceable because Mr. Bailey made a false statement in the Petition when he certified that IMS's failure to pay the 11.5-year maintenance fee was unintentional.  (Visage's First Am. Answer, Dkt. [60] at 7-8; Pro Medicus's First Am. Answer, Dkt. [61] at 20-21.) Visage also filed four counterclaims against 3D Medical, MedFlex, and Mr. Bailey (collectively "Counterclaim Defendants") for: (1) a declaratory judgment that the '655 patent is unenforceable due to inequitable conduct; (2) bad faith assertions of patent infringement under O.C.G.A. § 10-1-770 *et seq.*; (3) deceptive trade practices under O.C.G.A. § 10-1-370 *et seq.*; and (4) attorney's fees and costs under 35 U.S.C. § 285.  (See Visage's First Counterclaims, Dkt. [62].)  Counterclaim Defendants have now filed a Motion for Partial Summary Judgment [67] on the issue of alleged inequitable conduct. Defendants have filed a Cross-Motion for Partial Summary Judgment [72] on the same issue.

## Discussion

I. **Legal Standard**

Federal Rule of Civil Procedure 56 requires that summary judgment be

7

granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

8

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences that are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser

9

Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

**II.     Analysis**

The sole issue here is whether, by certifying that IMS's non-payment of the 11.5-year maintenance fee was unintentional, Mr. Bailey engaged in inequitable conduct.  Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of the patent.  Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). "To prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." In re Rosuvastatin Calcium Patent Litig., 703 F.3d 511, 519 (Fed. Cir. 2012) (citing Therasense, 649 F.3d at 1287). "Materiality and intent must be separately established." Id.  While inequitable conduct is most often based on conduct occurring during patent prosecution, the Federal Circuit has also applied it to conduct that takes place after a patent has issued.  See Ulead Sys., Inc. v. Lex Comput. & Mgmt. Corp., 351 F.3d 1139, 1144 (Fed. Cir. 2003) (extending the doctrine of inequitable conduct "into other contexts, like the present one, where the allegation is that

10

inequitable conduct has occurred after the patent has issued and during the course of establishing and paying the appropriate maintenance fee").

Before even arriving at the elements of inequitable conduct, Counterclaim Defendants argue that Mr. Bailey's certification cannot constitute inequitable conduct due to the Federal Circuit's decision in Network Signatures, Inc. v. State Farm Mut. Auto Ins. Co., 731 F.3d 1239 (Fed. Cir. 2013). That case, like this one, involved allegations of inequitable conduct in the process of paying a maintenance fee. There, the patent at issue lapsed when the attorney for the patent owner—the Naval Research Laboratory ("NRL")—chose not to pay the 7.5-year maintenance fee because he did not know of any commercial interest in the patent. Id. at 1241. Within two weeks after the final payment deadline, Network Signatures contacted the NRL to inquire about licensing the patent.[2] Id. Network Signatures had been trying to reach the NRL since before the deadline but with no success. Id. Immediately after receiving the inquiry, the NRL's attorney filed a petition with the PTO—seemingly identical to the one Mr. Bailey filed—for delayed payment of

---

[2] To be precise, the company that contacted the NRL was actually Network Signatures' predecessor.

11

the maintenance fee.  Id.  That petition, like the one here, was on the PTO's standard form and was pre-populated with the statement that the delay in payment was "unintentional."  Id.  The PTO granted the NRL's petition a week later.  Id.  The NRL then licensed the patent to Network Signatures.  Id.

Faced with infringement allegations, the defendant in Network Signatures argued that the patent was unenforceable.  It claimed that the NRL's attorney committed inequitable conduct in certifying that the delay in payment was "unintentional" when, in truth, he paid the fee only after learning of Network Signatures' interest.  Id.  The district court found that the certification *was* inequitable conduct, but the Federal Circuit reversed.  Id. at 1243-44.  In doing so, it held that the NRL attorney's "compliance with the standard PTO procedure for delayed payment, using the PTO form for delayed payment, does not provide clear and convincing evidence of withholding of material information with the intent to deceive the Director."  Id. at 1243.  The Federal Circuit also noted an "'unwillingness to extinguish the statutory presumption of validity' where the patentee's conduct 'did not affect the issuance of the patent.'"  Id. at 1244 (citing Therasense, 649 F.3d at 1291).

Counterclaim Defendants argue that the Federal Circuit's language in

12

<u>Network Signatures</u> immunizes them from a finding of inequitable conduct because Mr. Bailey used the PTO's standard form. (Counterclaim Defs.' Br. in Supp. of Mot. for Part. Summ. J. ("CC Defs.' MPSJ Br."), Dkt. [67-1] at 14.) The Court rejects that argument for two reasons.

First, a key factual difference separates this case from <u>Network Signatures</u>. The NRL's attorney had personal knowledge of the reasons for non-payment; Mr. Bailey did not. When he submitted the petition, the NRL's attorney knew that the reason he did not pay the maintenance fee was his mistaken belief that there was a lack of commercial interest in the patent. Whether he was right or not, he could have thought that his mistake of fact meant his non-payment was indeed "unintentional." Put another way, he at least knew of facts that informed his certification. Not so with Mr. Bailey. It is undisputed that Mr. Bailey had no personal knowledge of IMS's motivations for failing to pay the maintenance fee on time. (Defs.' SMF Resp., Dkt. [72-3] ¶ 17.) Nor did he conduct any investigation into whether IMS's failure to pay was intentional or unintentional. (Bailey Depo., Dkt. [72-8] at 84:6-12.) So unlike the NRL's attorney, Mr. Bailey submitted the Petition without any idea of whether his certification was true.

13

Second, and perhaps more importantly, if Counterclaim Defendants' interpretation of Network Signatures were correct, it would mean that inequitable conduct could never arise from the payment of a late maintenance fee as long as the patentee used the PTO's standard form.  But the Federal Circuit's holding in Network Signatures is not that broad.  Again, it says that "*Mr. Karasek's* [the NRL attorney] compliance with the standard PTO procedure . . . does not provide clear and convincing evidence of withholding of material information with the intent to deceive the Director."  Network Signatures, 731 F.3d at 1243 (emphasis added).  That is not the language of a sweeping rule.  Rather, it reflects a holding limited to the particular circumstances at hand.

A narrower reading of Network Signatures also follows from other Federal Circuit cases, which confirm that inequitable conduct *can* arise in circumstances similar to those here.  For example, in Ulead, the Federal Circuit noted that inequitable conduct can occur when a patentee "makes a request to correct incorrect payment of [maintenance] fees as a small entity knowing that it does not satisfy the good faith standard [required to make that request]."  Ulead, 351 F.3d at 1150; see also Nilssen v. Osram Sylvania, Inc., 504 F.3d

14

1223, 1231 (Fed. Cir. 2007) ("[I]t is not beyond the authority of a district court to hold a patent unenforceable for inequitable conduct in misrepresenting one's status as justifying small entity maintenance payments."). Likewise, in Aristocrat, the Federal Circuit addressed the importance of "the [patent] applicant's absolute compliance with the internal rules of patent examination." Aristrocrat Techs. Australia PTY Ltd. v. Int'l Game Tech., 543 F.3d 657, 663 (Fed. Cir. 2008). It noted that such compliance "becomes irrelevant after the patent has issued," but only "[a]bsent proof of inequitable conduct." Id. Put another way, "where the procedural irregularity involves an 'affirmative misrepresentation of a material fact . . . coupled with an intent to deceive,' it may rise to the level of inequitable conduct." Id. (citing Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1378 (Fed. Cir. 2008)). So inequitable conduct can arise in many different contexts—including post-issuance procedural matters like the payment of maintenance fees—as long as its elements are met. Network Signatures does not stand for the broad proposition that Counterclaim Defendants argue, nor does it bar a finding of inequitable conduct in this case.

Even so, Defendants still bear the burden of proving, by clear and convincing evidence: (1) that Mr. Bailey made a material misrepresentation or

15

omission; and (2) that he did so with the specific intent to mislead or deceive the PTO. See In re Rosuvastatin, 703 F.3d at 519 (citing Therasense, 649 F.3d at 1287). The Court finds that Defendants have carried their burden.

First, the Court notes that Mr. Bailey's certification was indeed a misrepresentation. In certifying that IMS's non-payment was "unintentional," Mr. Bailey represented to the PTO that he knew that to be true. In reality, however, Mr. Bailey lacked any knowledge of why IMS did not pay the maintenance fee. (Defs.' SMF Resp., Dkt. [72-3] ¶ 17.) In that sense, Mr. Bailey's certification was a misrepresentation because it represented that he knew something he did not. Going one step further, even if Mr. Bailey *had* known why IMS did not pay the maintenance fee, he could not have truthfully certified that its non-payment was "unintentional." The correspondence between IMS's president and its patent attorney show a deliberate decision "to let [the '655 patent] go." (Jan. 7, 2013 Kneale Email, Dkt. [72-15] at 1.) So even setting Mr. Bailey's willful blindness aside, his certification was still a misrepresentation.

Next, the Court finds that Mr. Bailey's misrepresentation was material. Materiality exists when "the PTO would not have allowed the claim but for the

16

nondisclosure or misrepresentation." Network Signatures, 731 F.3d at 1242 (quoting In re Rosuvastatin, 703 F.3d at 519). Here, materiality is straightforward. The PTO regulations expressly require a petition for acceptance of late maintenance fees to include "[a] statement that the delay in payment of the maintenance fee was unintentional." 37 C.F.R. § 1.378(b)(3). Had Mr. Bailey not certified that he knew the delay was unintentional, he would not have met the petition's requirements and the PTO would not have reinstated the '655 patent. That satisfies the "but for" materiality requirement. See Ulead, 351 F.3d at 1146 (finding "no serious question" that patentee's misrepresentation that it qualified as a small entity was material "to the PTO's acceptance of reduced maintenance fees, and thus, survival of the patent.").

Finally, the Court finds that Mr. Bailey made the misrepresentation with the specific intent to deceive the PTO. "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." Therasense, 649 F.3d at 1290. Still, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008). Of course, Mr. Bailey denies submitting the Petition with the

17

specific intent to deceive the PTO. (Counterclaim Defs.' Reply in Supp. of Mot. for Part. Summ. J. ("CC Defs.' MPSJ Reply"), Dkt. [78] at 13-14.) But the circumstantial evidence suggests otherwise. Mr. Bailey admitted during his deposition that, when he submitted the Petition, he did not know whether IMS's non-payment was unintentional. (Bailey Depo., Dkt. [69] at 119:8-21.) He also admitted that he had not investigated that question. (Id. at 84:6-12.) Nonetheless, Mr. Bailey certified to the PTO—with no knowledge of whether it was true—that the non-payment was in fact unintentional.

    Despite that evidence, Mr. Bailey argues that he did not intend to deceive because he "believed that he was allowed to reinstate the patent . . . based on the facts as he understood them at the time, and that no further investigation was required." (CC Defs.' MPSJ Reply, Dkt. [78] at 14.) The Court is not convinced. The Petition contains an express certification "that the delay in payment of the maintenance fee to this patent was unintentional." (Petition, Dkt. [72-22] at 1.) Even if, before filling out the Petition, Mr. Bailey believed that he could reinstate the patent based only on the facts as he then understood them, that language should have given him pause. But it did not, and he proceeded with making a representation of which he admits he had no

18

knowledge.  The single most reasonable inference to be drawn from that evidence is that Mr. Bailey made the misrepresentation with the specific intent to deceive the PTO.

Because Mr. Bailey's actions in reviving the '655 patent constituted inequitable conduct, the Court **DENIES** Counterclaim Defendants' Motion for Partial Summary Judgment [67] and **GRANTS** Defendants' Cross-Motion for Partial Summary Judgment [72].

## Conclusion

As discussed above, Counterclaim Defendants' Motion for Partial Summary Judgment [67] is **DENIED** and Defendants' Cross-Motion for Partial Summary Judgment [72] is **GRANTED**.

**SO ORDERED**, this 11th day of January, 2017.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)